## Case No. 4,353.

### The ELIZABETH v. RICKERS et al.

[2 Paine, 291.] [1]

Circuit Court, S. D. New York. Dec. 1831. [2]

[1] [Reported by Elijah Paine, Jr., Esq.]
[2] [Affirming and modifying Case No. 4,361.]

THOMPSON, Circuit Justice. This case comes up on appeal from the decreee of the district court for the southern district of New York. [3] Several minor points have been made and argued at the bar, which it will not, according to the view which I have taken of the case, be necessary for me to notice. The claim set up in the libel is for wages, and compensation for short allowance. Exceptions were taken, in the court below, to the answer, which, however, I shall not stop to notice, as they appear to have been disposed of by arrangement between the parties, and not finally passed upon by the district judge. It is unnecessary for me, also, to consider the point, whether this suit was prematurely commenced, or whether that question was open for the decision of the court below, after the proceedings before the magistrate preliminary to the filing of the libel. That wages are due, unless they have been forfeited, is very satisfactorily established by the proofs; and the material inquiries will be, whether any forfeiture has been incurred, and whether the libellants are entitled to the compensation decreed by the district court for short allowance.

The ground upon which a forfeiture of wages is set up, as applicable to the whole crew, is, that they deserted and abandoned the ship without unloading her cargo, and before the same was unladen, and before ten days had elapsed after said vessel had been safely moored; and with respect to several of the crew, a forfeiture is set up on account of disobedience of orders and mutinous conduct, as well as desertion. [4]

With respect to the first ground, the district judge considers it yet an open question whether a forfeiture of wages can be incurred by the seamen by desertion, at the port of

[3] [See Case No. 4,361.]
[4] In Cloutman v. Tunison [Case No. 2,907], Judge Story said:—"It is commonly enough supposed, that an absence from the ship without leave of the proper officer, or in disobedience of his orders, constitutes desertion. But this is certainly a mistake. Desertion, in the sense of the maritime law, is a quitting of the ship and her service, not only without leave, and against the duty of the party, but with an intent not again to return to the ship's duty. There must be the act of quitting the ship, animo derelinquendi, or animo non revertendi. If a seaman quits the ship without leave, or in disobedience of orders, but with an intent to return to duty, however blamable his conduct may be, (and it is certainly punishable by the maritime law, not only by personal chastisement, but by damages by way of diminished compensation,) it is not the offence of desertion to which the maritime law attaches the extraordinary penalty of forfeiture of all antecedent wages. And even in a case of clear desertion, if the party repents of his offence, and seeks to return to duty, and is ready to make suitable apologies, and to repair the injury sustained by his misconduct, he is entitled to be received on board again, if he tenders his services in a reasonable time, and before another person has been engaged in his stead, and his prior conduct has not been so flagrantly wrong, that it would justify his discharge. Upon this subject it is well known that the maritime law

discharge where the voyage terminates for which they shipped. It is unnecessary for me to decide this point in this case; and I the more readily waive it, as the district judge seems rather inclined against a forfeiture of wages in such case. It is, therefore, expedient to leave it an open question until that point shall become the point in judgment. It does not necessarily arise here, because if the seamen were discharged, there would be no desertion; and I think, on an attentive examination of the testimony, the weight of evidence is, that from the acts and declarations of the master, the seamen had good grounds to conclude that the master assented to their leaving the vessel as they did; and although they might not have been formally discharged according to the understanding of the captain, and as he has sworn, yet if his conduct was such as to give the seamen reasonable grounds to conclude that they left the ship with his assent, it would be harsh to visit with a forfeiture of wages a misapprehension on the subject. I forbear to enter into an examination of the evidence on this point, as I entirely concur in the conclusion to which the district judge has arrived.

A point has been made on the argument here, as to the competency of the seamen to testify for each other. This objection does not appear to have been made in the court below; and it would be a sufficient answer to it that it comes now too late. I would, however, barely observe, that although there is some diversity of practice in admiralty courts on this question, where the seamen have a common interest in the immediate point in dispute, yet I think the more general and better opinion is, that the objection should go to the credit, and not to the competency, of the witness, considering it an interest in the question only, and not in the event, analogous to the rule adopted in the courts of common law.

The allegation of misconduct and disobedience of orders extends only to Rickers, Davis and Foy. Although I am not very well satisfied with the conduct of Rickers, and am inclined to think it would have been dealing justly with him to have made some deduction from his wages, yet I am not disposed to interfere with the decree as to him. The conduct of Davis and Foy was extremely reprehensible; and had it been treated by the captain as a sufficient cause for their dismission or suspension from duty, it might perhaps have been considered sufficient grounds for forfeiting their wages; but the master

encourages a reasonable indulgence to human infirmity, and especially to the known thoughtlessness and rashness of seamen. It favors repentance and condonation; and will not permit a master to insist upon the utmost stretch of authority, or forfeiture, unless there is a clear propriety in exerting it. My learned friend, Mr. Chancellor Kent, has, in his Commentaries (volume 3, 2d Ed., lect. 46, p. 198), put this doctrine on its right footing, and persuasively shown its justice and sound policy.

"But there must not only be a desertion, but the desertion must be in the course of the voyage, and before its termination in the home port, to justify an infliction of the forfeiture by the maritime law. It is not sufficient that there has been a desertion after the voyage has ended, although it be within the period for which the party is bound to do duty on board the ship. It must be during the voyage. Now, when is the voyage ended, in the sense of the maritime law? I answer, when the ship has arrived at her last port of destination, and is moored in good safety in the proper and accustomed place. I do not say that the officers or seamen are then discharged from any farther duty, and are not bound to attend to the unlivery of the cargo. On the contrary, I maintain that the seamen, and a fortiori the officers, are bound to remain by the ship and watch over her concerns and assist in the unlivery of the cargo, if made in a seasonable time; unless there be some express or implied agreement, or established usage, to dispense with their farther services. There is a clause in the common ship articles, pointed to this very duty. 'And whereas,' says the clause, 'it is customary for the officers and seamen, on the vessel's return home in the harbor, and whilst her cargo is delivering to go on shore each night to sleep, greatly to the prejudice of such vessel and freighters, be it further agreed by the said parties, that neither officer or seaman shall, on any pretence whatever, be entitled to such indulgence; but shall do their duty by day in discharging the cargo, and keep such watch by night as the master shall think proper to order for the preservation of the same.' "

"It is manifestly implied in the reasoning of that truly great judge, (princeps inter pares,) Lord Stowell, in the case of The Pearl, 5 C. Rob. Adm. 224, which has been cited at the bar. But it is still more directly announced in the more recent case of The Baltic Merchant, Edw. 86. In this latter case, which turned upon the very point, whether the voyage was ended by a mere arrival in port, Lord Stowell on that occasion said: 'By interpretation of law, the voyage is not completed by the mere act of arrival. The act of mooring is an act to be done by the crew; and their duty extends to the time of the unlivery of the cargo. There is no period at which the cargo is more exposed to hazard, than when it is in the act of being transferred from the ship to the shore; and, therefore, the law, not only the old law, but particularly the statute, by which the West India trade has been in later times regulated,' (and the case before him was of a West India ship,) 'has enjoined in the strictest manner, that the mariners shall stay by the vessel until the cargo is actually delivered. I take this to have been always a part of the duty of the mariners: their contract is legally understood to go this length; and there never can have been a time when the owner was not entitled to some consideration against the mariners, on account of the non-completion of the contract. This is a consideration not in modum poenae, but it is a civil compensation for injury received, existing in all reason and justice antecedently to any statute upon the subject.' His lordship here points out the very distinction between cases of compensation for an imperfect performance of the contract, and cases of forfeiture for desertion, which are strictly in poenam. And he afterwards proceeded to decide that the voyage in that case could not, upon the true construction of the statutes on the subject of the West India trade, be deemed to be ended (not until the cargo was unlivered, but) until the vessel was safely moored in the West India docks; and when so moored, he held the voyage complete and ended, so that the forfeiture for desertion would not afterwards attach. But the desertion being before such mooring, he pronounced for a forfeiture in the case."

adopted a different, and probably the better course, by punishing and continuing them in the discharge of their duty. This ought to be considered a waiver of the claim to a forfeiture. They have also been punished by a deduction from their wages; and with the decree of the district court in this respect, I am satisfied.

The district court has also decreed to all the libellants, except Rickers and Anderson, a compensation for short allowance. This part of the decree is not satisfactorily sustained by the proofs in the cause. The act of congress of the 20th of July, 1790 (2 Laws U. S. 119, § 6) requires, that every ship or vessel belonging to a citizen or citizens of the United States, bound on a voyage across the Atlantic ocean, shall, at the time of leaving the last port from whence she sails, have on board, well secured under deck, at least sixty gallons of water, one hundred pounds of salted flesh meat, and one hundred pounds of wholesome ship-bread, for every person on board such ship or vessel, over and above such other provisions, stores and live stock as shall, by the master or passengers, be put on board; and in like proportion for longer or shorter voyages: and in case the crew of any ship or vessel, which shall not have been so provided, shall be put upon short allowance, in water, flesh or bread, during the voyage, the master or owner of such ship or vessel shall pay to each of the crew one day's wages beyond the wages agreed on, for every day they shall be so put to short allowance.

The specific allegation in the libel is, that the libellants were not, from the 7th day of April until the third day of June, 1830, during the voyage from the port of London to the port of New York, supplied with good and wholesome provisions for their sustenance, although it was fully within the power of the master, at all times, to have supplied the same; but, on the contrary thereof, they received from the said master a short allowance of bread.

There is, also, a general allegation, that the ship had not on board, at the time of leaving the port of London, well secured under deck, the quantity and quality of bread and provisions required by the act of the 20th of July, 1790. The master or owner is subjected to the penalty of paying extra wages only when the crew shall be put on short allowance of water, flesh or bread, and the vessel shall not be provided as the act requires; both must concur, by the terms of the act, and according to the rules of construing penal statutes. There is no complaint of being put on short allowance, except as to bread. This is the specific allegation in the libel. The allegation that the libellants were not supplied with good and wholesome provisions, and all the evidence as to the quality of the provisions, which forms a considerable portion of the testimony, are irrelevant to the point whether or not the crew were put on short allowance of bread. In order to apply the evidence to the question whether, in point of fact, the crew were put on short allowance, it would seem necessary to define what is meant in the statute by the terms short allowance. The statute has nowhere defined what shall be considered a full allowance. No judicial decision upon that point has been referred to on the argument, nor has any fallen under my notice. No evidence has been given of any usage or practice in the merchants' service, to aid the court in the construction of the statute. Under these circumstances, I feel some difficulty in defining what shall be considered short allowance. By the act of congress, passed the 1st July, 1797 (3 Laws U. S. 6 [1 Stat. 524, § 7]) providing a naval armament, a pound of bread a day is required to enter into the composition of a ration; and in the absence of any regulation by law on this subject in the merchants' service, I think it reasonable to assume that a pound of bread a day to each man would be a full allowance of that article, and anything less than that would, of course, be short allowance. To subject the master or owners to the extra wages, the crew must be put upon short allowance; by which I should understand that there must be some order or command to that effect given, or some gross negligence in the master. An accidental or unintentional deficiency in weight would not subject the master or owner to the penalty.

If the evidence in the cause is examined with this understanding of the law, it appears to me very clearly that the crew were not, in point of fact, put upon short allowance in bread. The witnesses on the part of the libellants, with the single exception of Ellison, whose testimony is very unimportant, consisted of the crew themselves; and all of them, except Rickers and Anderson, claiming compensation for short allowance. Although they were competent witnesses, yet they were so directly interested in the question, that their testimony, when brought in conflict with other witnesses, ought to be received with caution. But I do not perceive that, upon the inquiry as to short allowance in bread, there is any material conflict. The crew in answer to the inquiry, speak very generally that they were put on short allowance, some fixing one time, and some another; most of them, however, fix the 7th of April. But when they speak of short allowance, I understand them to mean short of a pound a day. Foy says they were put on short allowance, and yet says a pound of bread a day was weighed out to them. Shaply says they were put on short allowance, or if put on full allowance, they did not get it. Rickers, who was too unwell to do duty almost the whole voyage, says the crew, one day when he came on deck, were complaining that they were short of bread. He asked them to show it to him, and he considered it a little short. Some days after they were again complaining, and he saw for several evenings afterwards the bread in the

barge, and in his judgment it fell short in weight. These witnesses evidently mean by short allowance of bread, short of a pound a day to each man. But this question, it appears to me, must be put at rest by the testimony of the steward and first mate. It is worthy of notice, however, that Rickers' testimony is rendered a little suspicious by that of Morgan, one of the passengers, who represents him as being the great cause of the difficulty between the captain and crew. Dearborne, the steward, says, after being out about twenty days from London, the crew were put on short allowance of bread. He does not explain what he means by short allowance, but goes on to state that the allowance was a pound a day per man. He weighed it by order of the captain about a dozen times, and marked the barge where the eleven pounds came; and when he measured it, he believes he put in the same quantity as when he weighed it. That on the night of the difficulty with Foy, he went forward and called for the barge at the forecastle door. Foy handed it to him, and said, "do not put much in tonight, l am coming aft to kick up a row with the captain." He, however, gave them their full allowance. Howe, the chief mate, says, after being out about a week or ten days from London, the crew were put upon a pound of bread a day. The captain ordered him to see the crew had each a pound of bread a day; and he goes on to state that when the vessel arrived in New York, there was on board from five to seven hundred weight of bread, and five barrels of beef and pork; so that there could have been no possible inducement to put the men on short allowance. He says, also, that when they left London, the bread-room, which will hold about twenty-two hundred weight, was nearly full; a hundred or two weight would have filled it. There is evidence also leading pretty satisfactorily to the conclusion, that the bread was wasted by the crew, and that their complaints were entirely unfounded, and I cannot, from any attentive examination of the evidence, resist the conclusion that the crew were not, in point of fact, put upon short allowance of bread, within the sense and meaning of the act of congress; and they were not, of course, entitled to any extra pay on that account. If the evidence on this point struck me as nearly balanced, or but little preponderating in favor of the appellants. I should not think proper to disturb the decree, especially as some of the witnesses were in the court examined in open court, and a better opportunity afforded of judging of their credibility. But as I am so strongly impressed from the evidence, when taken all together with the injustice of the claim for short allowance, I cannot consent to impose it upon the appellants.

This must, accordingly, be expunged from the decree of the district court, which is in all other respects affirmed, but no costs on the appeal to be allowed on either side.